1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

TACUMA J. MWANZA,

                                        Plaintiff,

        v.

DEPUTY DIRECTOR FOSTER, et. al.,

                                        Defendants.

Case No. 3:14-cv-00331-MMD-WGC

**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

12        This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Defendants' Motion to Dismiss Counts I and II of Plaintiff's Second Amended Complaint

16   (SAC). (Electronic Case Filing (ECF) No. 48.) Plaintiff filed a response (ECF No. 50)[1], and

17   Defendants filed a reply (ECF No. 51).

18        After a thorough review, the court recommends that Defendants' motion be granted in

19   part and denied in part.

20                                    **I. BACKGROUND**

21        Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

22   proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (SAC, ECF No. 45.) The events

23   giving rise to this action took place while Plaintiff was housed at High Desert State Prison

24   (HDSP) and Ely State Prison (ESP). (*Id.*) Defendants are Renee Baker, Harold Byrne, Steve

25

26

27

28

---

[1] Plaintiff titles his response as a "partial" opposition to Defendants' motion. The connotation appears to reflect the fact that Defendants' have only filed a "partial" motion to dismiss, insofar as they do not attack Count III of the SAC. Plaintiff addresses all arguments asserted in Defendants' motion with respect to Counts I and II.

Collard, Michael Fletcher, Sheryl Foster, William Gittere, Angela Gregersen, Cade Herring, Paul Hunt, Dwight Neven, Michael Oxborrow, Lawrence Panozzo, and Tasheena Sandoval. (*Id*.)[2]

The Second Amended Complaint contains three counts. Only Counts I and II are the subject of Defendants' motion.

Count I is asserted against defendants Panozzo, Hunt, Gittere, Neven, and Foster. (ECF No. 45 at 6, 20, 22-24.) Plaintiff alleges that while he was at HDSP, Panozzo failed to serve him with a notice of charges (OIC # 355608), and Plaintiff did not realize he was accused of violating a prison rule until Panozzo sent the disciplinary form to him on March 5, 2013. (ECF No. 45 at 6.) On June 13, 2013, he was sent to ESP. (*Id*.) On June 25, 2013, Hunt met with him and served him with a notice of charges for another disciplinary incident (OIC # 359991). (*Id*.) He pled guilty, and Hunt told him that when the disciplinary hearing officer called him to the hearing he should refuse and that the hearing officer would be lenient. (*Id*. at 6, 20.) Hunt did not tell Plaintiff he had a disciplinary hearing pending on the charges in OIC # 355608. (*Id*. at 20.) Plaintiff took Hunt's advice and refused to go to the hearing, which Gittere held on June 26, 2013. (*Id*.) The hearing was with respect to OIC # 355608, and Plaintiff was never afforded an opportunity to defend himself. (*Id*. at 20, 22.) Gittere sent him a summary of the hearing on June 27, 2013. (*Id*. at 22.) He was sentenced to sixty-days without appliances and 180 days in disciplinary segregation. (*Id*.)

Plaintiff filed a grievance that he was denied a notice of charges, but Neven denied it stating that the disciplinary conviction would stand because Plaintiff waived his disciplinary hearing. (*Id*.) He sent a second level grievance to Foster, who also found the conviction should be upheld because Plaintiff waived his hearing. (*Id*. at 22-23.)

Count I of the SAC goes on to state a variety of allegations regarding the difference between general population and disciplinary segregation, which will be discussed in detail below. (*See id*. at 23-24.)

---

[2] As the court discusses in a separate order addressing Plaintiff's motion to dismiss defendant L. Bothe (ECF No. 64), defendant Bothe was dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m) as a result of Plaintiff's failure to timely serve Bothe with the summons and complaint. (*See* ECF No. 66.)

1    While Count I makes passing reference to the Eighth Amendment and the Fourteenth

2    Amendment's Equal Protection Clause (*id.* at 6), there are no allegations implicating either;

3    therefore, the court will construe the Count I of the SAC as asserting only a procedural due

4    process claim under the Fourteenth Amendment.

5    Count II is asserted against defendants Neven, Sandoval, Oxborrow, Gittere, Baker,

6    Foster (and dismissed defendant Bothe). (*Id.* at 7-15.) Plaintiff alleges that he was sentenced to

7    eighteen months of disciplinary segregation and referred for the loss of 180 days of good-time

8    credits on OIC # 358479. (ECF No. 45 at 7.) He claims that he appealed and on October 23,

9    2013, Neven modified both disciplinary sanctions by reducing the disciplinary segregation time

10   down from eighteen months to twelve months, and the good-time credit loss from 180 days to

11   ninety days. (*Id.*) Despite being made aware of the modifications, he alleges that Sandoval,

12   Oxborrow, Gittere, and Baker (as well Bothe) refused to acknowledge the modification which

13   resulted in him spending six months more than he should have in disciplinary segregation, and in

14   being deprived of 180 instead of ninety days of good-time credit. (*Id.* at 7-13.) Count II contains

15   similar allegations concerning the conditions in disciplinary segregation compared to those of

16   general population. (*Id.* at 13-14.)

17   Count II of the SAC makes reference to the Eighth Amendment as well as the Due

18   Process Clause of the Fourteenth Amendment (*id.* at 7); however, Count II contains no

19   allegations implicating the Eighth Amendment. The court will construe Count II of the SAC as

20   asserting only a procedural due process claim under the Fourteenth Amendment.

21   Count III is asserted against Collard, Herring, Byrne, Fletcher, Sandoval, and Gregersen.

22   (*Id.* at 16.) Plaintiff alleges he was forced to strip down and walk two hundred yards to the

23   infirmary in the presence of two female staff members, and his requests to put on clothing were

24   denied for no legitimate penological reason. (*Id.*)

25   Count III references the Fourth and Eighth Amendments; however, the allegations do not

26   implicate the Eighth Amendment. (*Id.*) As a result, the court construes Count III of the SAC as

27   asserting only a violation of the Fourth Amendment.

28

- 3 -

1    Defendants move to dismiss Counts I and II arguing: (1) that Plaintiff fails, as a matter of

2    law, to allege an atypical and significant hardship resulted from his placement in disciplinary

3    segregation sufficient to implicate the protections of the Due Process Clause; and (2) insofar as

4    Plaintiff challenges a disciplinary sanction that affected his sentence or duration of confinement,

5    Count II is *Heck*-barred.

6    ## II. LEGAL STANDARD

7    Federal Rule of Civil Procedure 12(b) contemplates the filing of a motion to dismiss for

8    the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

9    Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab.*

10   *Corp. of America*, 232 F.3d 719, 723 (9th Cir. 2000). In reviewing the complaint under this

11   standard, the court must accept as true the allegations of the complaint, *Hosp. Bldg. Co. v.*

12   *Trustees of Rex Hosp.*, 425 U.S. 738, 740 (1976), construe the pleadings in the light most

13   favorable to plaintiff, and resolve all doubts in the plaintiff's favor, *Jenkins v. McKeithen*, 395

14   U.S. 411, 421 (1969). This does not apply, however, to "legal conclusions." *Ashcroft v. Iqbal*,

15   556 U.S. 662, 678 (U.S. 2009). "Threadbare recitals of the elements of a cause of action,

16   supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). "While legal

17   conclusions can provide the framework for a complaint, they must be supported by factual

18   allegations." *Id*. at 679.

19   Allegations in pro se complaints are held to less stringent standards than formal pleadings

20   drafted by lawyers, and must be liberally construed. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980);

21   *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam*); *Hamilton v. Brown*, 630 F.3d 889,

22   893 (9th Cir. 2011).

23   Under Federal Rule of Civil Procedure 8(a), "a claim for relief must contain...a short and

24   plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P.

25   8(a)(2).  The Supreme Court has found that at a minimum, a plaintiff should state "enough facts

26   to state a claim to relief that is plausible on its face." *Bell Atl.  Corp.  v.  Twombly*, 550 U.S. 544,

27   570 (2007); *see also Iqbal*, 556 U.S. at 678.

28

- 4 -

The complaint need not contain detailed factual allegations, but it must contain more than a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678. It must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "The pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id*. (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)).

The Rule 8(a) notice pleading standard requires the plaintiff to "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. (internal quotation marks and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "Plausibility" is "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citation omitted). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.  at 679 (citation omitted).  Allegations can be deemed "implausible" if there are "obvious alternative explanation[s]" for the facts alleged. *Id*. at 682.

A dismissal should not be without leave to amend unless it is clear from the face of the complaint that the action is frivolous and could not be amended to state a federal claim, or the district court lacks subject matter jurisdiction over the action. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995) (dismissed as frivolous); *O'Loughlin v. Doe*, 920 F.2d 614, 616 (9th Cir. 1990).

## III. DISCUSSION

### A. Count I

The Fourteenth Amendment provides: "No state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. A plaintiff asserting a Fourteenth Amendment due process claim related to disciplinary action that leads to his confinement in disciplinary segregation must first establish that he has been deprived of a

protected liberty interest in order to invoke the Due Process Clause's protections. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). Once the plaintiff has established that one of these interests is at stake, the court's analysis turns to whether the inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003) (citations omitted).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' ... or it may arise from an expectation or interest created by state laws or policies[.]" *Wilkinson*, 545 U.S.  at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) (finding a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution under Due Process Clause itself) and *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974) (finding a liberty interest in avoiding withdrawal of state-created system of good-time credits)).

First, under the Constitution itself, a liberty interest is implicated when the conditions of confinement exceed "the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996) (internal quotation marks and citation omitted). The Ninth Circuit has recognized that "only the most extreme changes in the conditions of confinement" such as "involuntary commitment to a mental institution" and "forced administration of psychotropic drugs" have been found to "directly invoke the protections of the Due Process Clause." *Chappell*, 706 F.3d at 1063 (citing *Vitek*, 445 U.S. at 493-94; *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Other circumstances where a liberty interest has been found as arising from the Due Process Clause itself include: revocation of probation, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); revocation of parole status (not just mere denial of parole), *Morrissey v. Brewer*, 408 U.S. 471 (1972); and labeling an inmate as a sex offender, *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997).

Plaintiff does not include allegations that courts have recognized directly invoke the protections of the Due Process Clause; therefore, the court will turn to state-created liberty interests. *See Wilkinson*, 545 U.S. at 221-22 (citing *Meachum v. Fano*, 427 U.S. at 225) ("the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse

conditions of confinement."); *Chappell*, 706 F.3d at 1063 (quoting *Montayne v. Haymes*, 427 U.S. 236, 242 (1976)) ("'As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.'").

"A state may create a liberty interest through statutes, prison regulations, and policies." *Chappell*, 706 F.3d at 1063 (citing *Wilkinson*, 545 U.S. at 222 and *Neal*, 131 F.3d at 827). This, however, is "'subject to the important limitations set forth in *Sandin v. Conner*[.]" *Wilkinson*, 545 U.S. at 222. *Sandin* rejected the previously employed approach for evaluating whether there was a state-created liberty interest which looked at the mandatory language of prison regulations. *See id*. (citing *Sandin v. Conner,* 515 U.S. 472, 481 (1995)). Instead, *Sandin* directed that it was more important to look at the "nature of the deprivation." *Id*. (citing *Sandin*, 515 U.S. at 481).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). Thus, a change in the conditions of confinement, such as Plaintiff's confinement to disciplinary segregation, only rises to the level of a protected liberty interest if it amounts to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to the protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

Placement in punitive segregation alone does not make the conditions of confinement an "atypical and significant hardship." *Sandin*, 515 U.S. at 485; *Chappell*, 706 F.3d at 1063 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("the Due Process Clause does not protect against all changes in conditions of confinement even where they 'hav[e] a substantial adverse impact on the prisoner involved.'").

The Supreme Court has declined to establish a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (noting inconsistent conclusions among the circuits, but concluding that assignment to Ohio's

"Supermax" facility satisfied this standard "under any plausible baseline"). The Ninth Circuit has concluded, however, that to determine whether a particular form of restraint imposes "atypical and significant hardship," a court considers a condition or combination of conditions or factors on a case by case basis, rather than invoking a single standard." *Chappell*, 706 F.3d at 1064 (citing *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996) (confirming that the inquiry is "context-dependent" and requires "fact by fact consideration"). At least three factors have been used to guide this inquiry: (1) "whether the conditions of confinement mirrored those conditions imposed upon inmates in analogous *discretionary* confinement settings;" (2) "the duration and intensity of the conditions of confinement;" and (3) "Whether the change in confinement would inevitably affect the duration of the [prisoner's] sentence." *Chappell*, 706 F.3d at 1064-65 (italics original) (internal quotation marks and citation omitted). As such, "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003).

In *Sandin*, the inmate was sentenced to thirty days punitive segregation for allegedly interfering with prison officials during a strip search, and brought suit because prison officials refused to allow him to call witnesses at his disciplinary hearing. The Supreme Court concluded that his case did "not present a dramatic departure from the basis conditions of [his] indeterminate sentence." *Sandin*, 515 U.S. at 485. The conditions in disciplinary segregation mirrored those in administrative segregation and protective custody. *Id*. at 486. There, the plaintiff was in lockdown twenty-three hours a day while general population inmates were confined to their cells twelve to sixteen hours a day. The Court found that his placement in disciplinary segregation for thirty days "did not work a major disruption in his environment." *Id*. Nor was there evidence that placement in disciplinary segregation would affect the duration of his sentence. *Id*. at 487. The Court noted that the parole board was not required to deny parole because of a disciplinary record. *Id*.

In *Wilkinson*, the Supreme Court considered a challenge to Ohio's placement of prisoner's in its "Supermax" facility−a "maximum-security prison with highly restrictive conditions." *Wilkinson*, 545 U.S. at 213. Inmates were required to stay in their seven by fourteen foot cells for twenty-three hours a day with constant illumination; they could not communicate with other inmates and were deprived of almost all human contact; they were limited to one hour of exercise a day in a small, indoor room; their placement in the facility was indefinite, and after an initial thirty-day review, their placement was reviewed only once a year; and an inmate moved to the facility who was otherwise eligible for parole would become ineligible. *Id*. at 214, 215, 224. The Supreme Court found that while the conditions at the facility taken alone might not create a liberty interest, "taken together they impose an atypical and significant hardship within the correctional context" so as to create a "liberty interest in avoiding assignment" to the facility. *Id*. at 224 (citation omitted). Having found a liberty interest existed, the court concluded that the procedural protections afforded were sufficient. *Id*. at 225.

In *Brown v. Oregon Department of Corrections*, 751 F.3d 983 (9th Cir. 2014), the Ninth Circuit addressed a situation where a prisoner was placed in Oregon's Intensive Management Unit (IMU) for twenty-seven months. Inmates in the IMU were in solitary confinement for twenty-three hours a day. *Id*. at 985. They got out of their cells for forty minutes a day, thirty of which could be spent in recreation. *Id*. Half of that time (fifteen minutes) could be spent in an "outside" facility within a fifteen by forty foot room with high, concrete walls covered by a metal grate. *Id*. This was compared to inmates in general population who got twenty-five to thirty-five hours a week for recreation and social interaction, including two to five hours a day of outdoor recreation. *Id*. Inmates in the IMU got two non-contact visits per month and a maximum of two visitors in a six month period. *Id*. General population inmates got between eleven and twenty-two contact visits per month and an unlimited number of approved visitors. *Id*. IMU inmates were denied access to prison and law libraries, group religious worship, educational and vocational opportunities, telephone usage except in emergencies, access to televisions, and personal property. *Id*. Brown's status was reviewed four times between July 2008 and June 2009, with all four occurring between July and September of 2008, and then he was reviewed every

1   month and he was kept at the same level pending successful completion of assigned packets. He

2   filed eight petitions asking for review of his status.

3          The Ninth Circuit held that "under any plausible baseline, Brown's twenty-seven month

4   confinement in the IMU without meaningful review 'impose[d] atypical and significant

5   hardships on [him] in relation to the ordinary incidents of prison life.'" *Id*. at 988 (quoting

6   *Sandin*, 515 U.S. at 484). There, the Ninth Circuit pointed out that while the "baseline for

7   determining 'atypical and significant hardship' is not entirely clear[,] ... *Sandin* seems to suggest

8   that a *major* difference between the conditions for the general prison population and the

9   segregated population triggers a right to a hearing[.]" *Id*. (quoting *Keenan*, 83 F.3d at 1089)

10  (emphasis added). The court likewise pointed out that the Supreme Court has not clearly held,

11  however, that "conditions in the general population, as opposed to those in other forms of

12  administrative segregation or protective custody, form the appropriate baseline comparator." *Id*.

13  The Ninth Circuit, like the Supreme Court, declined to identify the baseline, but instead

14  concluded that Brown's confinement to the IMU imposed an atypical and significant hardship

15  under any baseline, noting that Brown was in solitary confinement for almost twenty-three hours

16  a day with almost no interpersonal contact, and was denied most privileges given to general

17  population inmates. *Id*. at 988. The Ninth Circuit noted that "these conditions alone might apply

18  to most solitary-confinement facilities," but the "crucial factor distinguishing confinement in the

19  IMU" was the duration of Brown's confinement: "a fixed and irreducible period of confinement

20  in the IMU for twenty-seven months, in contrast to the limited period of confinement with

21  periodic review afforded inmates in ODOC's other segregated housing units." *Id*.

22         Here, Plaintiff conflates the two components of a procedural due process claim, asserting

23  that Defendants have overlooked the allegation that he was not served with a notice of charges

24  before being subject to disciplinary sanctions. (*See* ECF No. 50 at 3-4, 7.) As outlined above,

25  before the court looks at the procedural protections an inmate is due, it must first determine

26  whether a liberty interest is implicated, *i.e.*, the court must analyze whether the circumstances

27  presented amount to an atypical and significant hardship in relation to the ordinary incidents of

28  prison life. Only when this is established does the court confront whether the inmate was

provided the applicable procedural protections. The court will now analyze whether Plaintiff has included allegations in the SAC sufficient to implicate a protected liberty interest.

In Count I, Plaintiff states generally that disciplinary segregation is a form of isolation from other inmates, while general population inmates can mingle with other inmates as they have daily access to the tier, main yard and gym. (ECF No. 45 at 24.) He asserts that inmates in disciplinary segregation have limits on the amount of property they may possess (one pair of shoes, two pairs of socks, two t-shirts, one jump suit), and may not purchase appliances, while general population inmates are permitted to purchase allowable property, clothing and appliances. (*Id*.) In disciplinary segregation, inmates must submit to a strip search each time they exit their cell and they are moved through the unit in full hand and leg restraints while general population inmates are not. (*Id*.) Inmates in disciplinary segregation are allowed only one shower every three days, while general population inmates may use the showers every day. (*Id*.) Disciplinary segregation inmates are permitted only one fifteen minute phone call per month, but general population inmates are permitted one phone call per day. (*Id*.) In disciplinary segregation, inmates are not permitted to attend religious services, training programs, work, or education, and are prohibited from possessing hobby craft, while general population inmates have these privileges. (*Id*.) Finally, disciplinary segregation inmates have a restricted canteen and may not participate in outside food or clothing programs unlike general population inmates. (*Id*.)

Defendants are correct that in an action involving another NDOC inmate, the undersigned found conditions analogous to those alleged by Plaintiff here did not amount to an atypical and significant hardship. (*Mizzoni v. State of Nevada, et. al.*, 3:11-cv-00186-LRH-WGC, ECF No. 78 (report & recommendation)). There, Mizzoni alleged that in disciplinary segregation he could not get a job, was denied personal property, clothing and certain appliances that general population inmates had; was denied clothing and food packages general population inmates could access; could only shower every three days; was denied the same yard access as general population inmates; was denied access hobby craft, the law library, religious activities, and to eat in the culinary; was denied to have his handcuffs and leg shackles removed like other general population inmates. (*Mizzoni v. State of Nevada, et. al.*, 3:11-cv-00186-LRH-WGC, ECF No. 40

at 10-11.) The undersigned noted that the length of time Mizzoni spent in disciplinary segregation (365 days) was significant, but there was no evidence that the conditions confronting him there were excessive compared to those in general population or that they worked a major disruption in his environment. (*Mizzoni v. State of Nevada, et. al.*, 3:11-cv-00186-LRH-WGC, ECF No. 78.) That determination was upheld by United States District Judge Larry R. Hicks, and subsequently by the Ninth Circuit. *See Mizzoni v. State of Nevada, et. al.*, 3:11-cv-00186-LRH-WGC, ECF Nos. 78 (report & recommendation), 85 (order affirming), 95 (Ninth Circuit memorandum affirming grant of summary judgment in favor of Defendants on due process claim).

Here, the court likewise finds that the allegations concerning the conditions in disciplinary segregation, which are essentially the same as those alleged in *Mizzoni*, do not rise to the level of an atypical and significant hardship. While there are differences between general population and disciplinary segregation, that is to be expected because after all, disciplinary segregation is imposed as a punishing sanction. The conditions described, however, do not present a major departure from those in general population or the sort of departure that courts have recognized as implicating a liberty interest.

The court must also look at the duration of the sanction. Plaintiff was sanctioned to 180 days in disciplinary segregation. While this is not a short amount of time, particularly from the point of view of the inmate serving the sanction, it is not excessive keeping in mind that the Supreme Court found a liberty interest was implicated when confinement to the Supermax facility was indefinite, and the Ninth Circuit's finding that a liberty interest was implicated with assignment to a restrictive facility for twenty-seven months with no meaningful review.

Finally, Plaintiff has not alleged that the imposition of this set of disciplinary sanctions affected the duration of his sentence.

For these reasons, the court finds that Plaintiff's allegations fail to implicate a protected liberty interest, so as to trigger any procedural protections under the Due Process Clause. As a result, it is recommended that Count I should be dismissed. Given that Plaintiff has already been granted an opportunity to amend this claim, the dismissal should be with prejudice.

**B. Count II**

To reiterate, in Count II Plaintiff alleges that he was found guilty of another disciplinary violation and was sanctioned to eighteen months in disciplinary segregation and referred for the loss of 180 days of good-time credits. (ECF No. 45 at 7.) Plaintiff filed a disciplinary appeal, and he claims Warden Neven modified the sanctions by reducing his disciplinary segregation time from eighteen months to twelve months and the good-time credit loss from 180 days to ninety days. (*Id*.) Despite Plaintiff notifying them of this modification, he alleges that Sandoval, Oxborrow, Gittere, Baker, and Foster refused to honor the modification. (*Id*. at 7-13.) He avers that this resulted in him spending an additional six months in disciplinary segregation, and the forfeiture of the entire 180 days of good-time credits, which affected his release date by ninety days. (*Id*. at 8-13.) He goes on to repeat the differences between confinement in disciplinary segregation and general population that were alleged in Count I. (*Id*. at 13-14.) He seeks only the recovery of monetary damages in connection with Count II. (*Id*. at 20.)

Defendants make two arguments with respect to Count II: (1) that Plaintiff's allegations, as a matter of law, do not rise to the level of an atypical and significant hardship; and (2) that if Plaintiff alleges that the Defendants' conduct affected the duration of Plaintiff's confinement (*i.e.*, by the revocation of earned statutory good time credits), the claim should be dismissed pursuant to *Heck* and the favorable termination rule until the sanction affecting the duration of confinement is invalidated. (ECF No. 48 at 8-10.)

Plaintiff argues that he does have an implicated liberty interest and that *Heck* does not bar his claim because he appealed his disciplinary conviction and was granted partial relief when Neven modified the sanctions. (ECF No. 50 at 5, 8.) He asserts that despite this the Defendants ignored Neven's modification resulting in him spending six more months in punitive segregation. (*Id*.) Plaintiff confirms that as a result of Defendants actions, he spent another six months in disciplinary segregation, and he was deprived of the ninety days of good-time credit Neven had awarded him back, which affected his release date by ninety days. (ECF No. 50 at 6:14-21.) Plaintiff appears to state that he raised the failure to reduce the 180 days of good time credit to ninety days in a habeas petition. (ECF No. 50 at 5:27-31, 8:11-15.)

1    The court will address the arguments in the order presented by Defendants. The

2    allegations about the difference between confinement in disciplinary segregation and in general

3    population are essentially the same as were asserted with respect to Count I. (ECF No. 45 at 13-

4    14.) Defendants do not address the other factors relevant to a determination of whether a liberty

5    interest is implicated: the duration and intensity of the confinement and whether it would

6    inevitably affect the duration of the inmate's sentence.

7    In Count I, the court concluded that there was not a drastic change between the conditions

8    in disciplinary segregation and general population, that the duration of the confinement (180

9    days) was not excessive, and that there were no allegations indicating that the sanction would

10   affect the duration of his sentence.  In Count II, by contrast, Plaintiff alleges that he was forced

11   to spend an additional six months in disciplinary segregation, but if Defendants had honored the

12   purported modification of Warden Neven, he would have been in general population during that

13   time. In addition, unlike Count I, Plaintiff alleges in Count II that the duration of his confinement

14   was affected-as the Defendants allegedly refused to honor the modification in the loss of good-

15   time credits from 180 days to ninety days. With facts supporting these additional factors present,

16   the court finds Plaintiff's SAC states a colorable due process claim in Count II. *See Jackson v.*

17   *Carey*, 353 F.3d 750, 756 (9th Cir. 2003) (finding that inmate alleged sufficient facts to survive

18   dismissal where he asserted conditions in Security Housing Unit, where he was confined even

19   after he successfully appealed the disciplinary hearing which should have nullified the order

20   transferring him there).[3]

21   The court will now consider Defendants' argument that Count II is *Heck*-barred.

22   In *Preiser v. Rodriguez*, inmates brought actions under section 1983 attacking the

23   constitutionality of prison disciplinary proceedings that resulted in them being deprived of good-

24   time credits. *Preiser v. Rodriguez*, 411 U.S. 475, 476, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

---

25

26   [3] In *Jackson*, the court noted: "The present inquiry is better suited for summary judgment. After discovery, the district court may determine whether the transfer and confinement in Corcoran-SHU after a disciplinary hearing

27   sentence has been ordered reissued and reheard constitutes an 'atypical and significant hardship,' thus infringing upon a protected liberty interest under *Sandin*. If the district court determines that Jackson possessed such a liberty interest, it must then determine whether Jackson was given all process due under *Wolff v. McDonnell*, 418 U.S. 539,

28   94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Duffy*, 98 F.3d at 457." The same is true here. The court finds Plaintiff has included sufficient facts in Count II to withstand a dismissal under Rule 12(b)(6).

They sought injunctive relief to restore their credits, which would result in their immediate release from prison. *Id*. There, the Supreme Court discussed the interplay between section 1983 and the habeas corpus statutes (which required exhaustion of state remedies), pointing out that the purpose of a habeas petition is to "secure release from illegal custody." *Id*. at 482-484. The Supreme Court concluded that the inmates' claims in seeking restoration of good-time credits which resulted in either immediate release from custody or in a shortening of their sentence were governed exclusively by a writ of habeas corpus. *Id*. at 487. Specifically, the Court held: "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id*. at 500.

The next year, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court considered a Due Process Clause challenge where the inmates attacked rules and practices of the prison which might result in taking good-time credits and sought restoration of good-time, submission of a plan for a hearing procedure in connection with withholding and forfeiture of good-time that satisfied the due process requirements, and damages for deprivation of their civil rights from use of the allegedly unconstitutional procedures. *Id*. at 553.

First, the Court addressed whether under *Preiser*, the validity of the procedures for depriving prisoners of good-time credits could be considered in a suit brought under section 1983. *Wolff* noted *Preiser*'s holding that a writ of habeas corpus was the sole remedy for the prisoner's suit which sought injunctive relief compelling restoration of good time credits which would result in a speedier release from prison. *Id*. a 554. The Supreme Court discussed the point made in *Preiser*, however, that "habeas corpus is not an appropriate or available remedy for *damages* claims, which, if not frivolous and of sufficient substance to invoke the jurisdiction of the federal court, could be pressed under s 1983 along with suits challenging the conditions of confinement rather than the fact or the length of custody." *Id*. (citing *Preiser*, 411 U.S. at 494, 498-99) (emphasis added). *Wolff* affirmed the decision of the appellate court to foreclose any claim for relief for the restoration of good-time credits. *Id*. Insofar as the action also sought

damages, the Supreme Court stated: "Preiser expressly contemplated that claims properly brought under s 1983 could go forward while actual restoration of good-time credits is sought in state proceedings." *Id.* (citing *Preiser*, 411 U.S. at 499 n. 14). As a result, the Supreme Court concluded that the damages claim was properly before the district court and "required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct." *Id.*

In *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the plaintiff was convicted and while the appeal of his conviction was pending he sued prosecutors and a police investigator under section 1983, alleging that they engaged in an unlawful investigation which lead to his arrest; that they destroyed exculpatory evidence; and caused an unlawful voice identification procedure to be used in his trial. *Id.* at 479. He sought compensatory and punitive monetary damages, but not injunctive relief. *Id.* The case again involved the interplay between section 1983 and the federal habeas statute (which requires exhaustion of state remedies as a prerequisite to filing an action). *Id.* The Supreme Court noted *Preiser*'s holding that habeas is the exclusive remedy when an inmate challenges the fact or duration of confinement and seeks immediate or speedier release. *Id.* at 481.

The Court also pointed out that the situation presented in *Heck* was not covered by *Preiser* because the inmate plaintiff did not seek immediate or speedier release, but monetary damages which he could not have achieved via a habeas petition. *Id. Heck* discussed the dicta in *Preiser* that a "state prisoner seeking only damages 'is attacking something other than the fact or length of ... confinement, and ... is seeking something other than immediate or more speedy release[,] ...a damages action by a state prisoner could be brought under [§ 1983] in federal court without any requirement of prior exhaustion of state remedies.'" *Id.* (citing *Preiser*, 411 U.S. at 494). *Heck* explained that the statement might not be true "when establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction[,] [because] [i]n that situation the claimant *can* be said to be 'attacking ... the fact or lengthy of ... confinement[.]'" *Id.* (emphasis original).

The Court also examined the petitioner's argument that this question had already been answered in *Wolff*. *Wolff*, like *Preiser*, involved a challenge to procedures used to deprive inmates of good-time credits, but *Wolff* sought restoration of good time credits and damages for civil rights deprivations from use of the allegedly unconstitutional procedures. *Id*. at 482 (citing *Wolff*, 418 U.S. at 553). As noted above, the good-time credit restoration claim was barred by *Preiser*, but *Wolff* held that the damages claim was properly before the district court. *Id*. (citing *Wolff*, 418 U.S. at 554). *Heck* clarified that this did not authorize the inmate to recover damages "measured by the actual loss of good time." The Supreme Court reflected that *Wolff* "recognized a § 1983 claim for using the wrong procedures, not for reaching the wrong result (*i.e.*, denying good time credits). *Id*. *Heck* also relied on the fact that there was no indication in the opinion or any reason to believe "that using the wrong procedures necessarily vitiated the denial of good-time credits" such that "the claim at issue in *Wolff* did *not* call into question the lawfulness of the plaintiff's continuing confinement." *Id*. (emphasis original) (citation omitted).

> The Supreme Court went on to hold that:
> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Heck*, 512 U.S. 477, 486 (1994).

Three years later, in *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Supreme Court confronted the question of "whether a claim for damages and declaratory relief brought by a state prisoner challenging the validity of the procedures used to deprive him of good-time credits is cognizable under § 1983." *Id*. at 643. Balisok was found guilty of a disciplinary violation and sentenced to ten days in isolation, twenty days in segregation, and deprivation of thirty-days of good-time credit. *Id*. He appealed the decision within the prison's administrative appeal system, but it was denied on grounds that he did not comply with the applicable requirements. *Id*. He filed a civil rights action under section 1983, arguing that the procedures used violated due process. *Id*. He did not seek restoration of good

time credits (as the sole remedy for such relief is a petition for writ of habeas corpus). *Id*. The

district court found that the claim was barred by *Heck* because a finding in his favor would

"necessarily imply the invalidity of the disciplinary hearing and the resulting sanctions." *Id*. at

644. The Ninth Circuit reversed, concluding that because Balisok challenged only the *procedures*

employed in the hearing, such a claim was cognizable under section 1983. *Id*.

> In reversing the Ninth Circuit, the Supreme Court distinguished *Edwards* from *Heck*: [His amended complaint] limited his request to damages for depriving him of good-time credits *without due process*, not for depriving him of good-time credits *undeservedly* as a substantive matter. That is to say, his claim posited that the procedures were wrong, but not necessarily that the result was. The distinction between these two sorts of claims is clearly established in our case law, as is the plaintiff's entitlement to recover at least nominal damages under § 1983 if he proves the former one without also proving the latter one.

*Id*. at 645 (emphasis original) (citation omitted). The Supreme Court concluded that the

procedural defect which Balisok complained of, "if established, [would] necessarily imply the

invalidity of the deprivation of his good-time credits." *Id*. at 646. Balisok alleged that during his

disciplinary hearing the hearing officer denied him the opportunity to call witnesses who had

exculpatory evidence to support his defense. *Id*.  Balisok also alleged that the reason the

exculpatory evidence witnesses were excluded was because the hearing officer was deceitful and

biased against him. *Id*. These facts, if established, would result in a decision setting aside his

disciplinary conviction and restoration of the good-time credits. *Id*. (citations omitted).

Therefore, the court determined that Balisok's action was not cognizable under section 1983. *Id*.

at 647. *Edwards* has been said to have "extended the favorable termination rule [announced in

*Heck*] to prison disciplinary actions that implicated the prisoner's term of confinement." *Ramirez

v. Galaza*, 334 F.3d 850, 856 (9th Cir. 2003).

In sum, "[s]uits challenging the validity of the prisoner's continued incarceration lie

within 'the heart of habeas corpus,' whereas 'a § 1983 action is a proper remedy for a state

prisoner who is making a constitutional challenge to the conditions of his prison life, but not to

the fact or length of his custody.'" *Ramirez*, 334 F.3d at 856 (quoting *Preiser*, 411 U.S. at 498-

99). In addition, "[t]his distinction applies whether the term of incarceration results from a

conviction or sentence imposed by a state court, or a prison disciplinary sanction." *Id*. (citing

1   *Edwards*, 520 U.S. at 645; *Heck*, 512 U.S. at 486-87). According to the Ninth Circuit, the key to

2   determining whether a section 1983 claim lies is "whether a successful § 1983 action would

3   necessarily render invalid a conviction, sentence, or administrative sanction that affected the

4   length of the prisoner's confinement." *Id*.

5         Here, the principal procedural defect complained of is the Defendants' failure to

6   recognize Neven's purported modification of Plaintiff's disciplinary sanction. As in *Edwards*, if

7   it is established that Defendants unlawfully failed to recognize the modification of Plaintiff's

8   sanction concerning the good-time credits, it would necessarily imply the invalidity of the

9   deprivation of ninety days of good-time credits. As a result, success on the claim for damages

10   would "necessarily imply the invalidity of the punishment imposed." *Edwards*, 520 U.S. at 648.

11   This is because this aspect of the sanction-the deprivation of good-time credits directly affects

12   the length of Plaintiff's confinement in prison.

13         Nevertheless, the allegations of the SAC overcome the *Heck* bar, because Plaintiff avers

14   that he had successfully obtained reversal of the sanctions effectively imposed by the Defendants

15   when Warden Neven modified the sanctions from eighteen to twelve months in disciplinary

16   segregation and from a 180 day loss of good-time credit to a ninety day loss of good-time credit.

17   In other words, Plaintiff has alleged that the sanctions imposed by Defendants- the full eighteen

18   months in disciplinary segregation and the 180 day loss of good time credit- were declared

19   invalid by one authorized to make such a determination. This is sufficient to withstand a motion

20   to dismiss. Defendants may argue on summary judgment, or at trial if there is a genuine dispute

21   of material fact, whether the sanctions were in fact modified or otherwise reversed as Plaintiff

22   alleges.[4]

23         The court must now address Count II insofar as it alleges that the failure to recognize the

24   modification to the disciplinary segregation component of the sanction was unlawful. This was

25   not squarely addressed in *Edwards*. In *Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003), *cert.*

26   *denied*, 541 U.S. 1063 (2004), the Ninth Circuit confronted the issue of whether the "favorable

27

28         [4] The court notes that this is unlikely as Plaintiff has since filed documentation that indicates his good-time
credit of ninety days was in fact restored by NDOC. (*See* ECF No. 64 at 7; ECF No. 67 at 7.)

termination rule" announced in *Heck* "applies to disciplinary sanctions that do *not* affect the fact or length of a prisoner's confinement." *Id*. at 854 (citations omitted). Noting that its conclusion is in line with all but one of the circuits that have considered the issue, the Ninth Circuit concluded that it does not:

> [T]he favorable termination rule does not apply to § 1983 suits challenging a disciplinary hearing or administrative sanction that does not affect the overall length of the prisoner's confinement. Where the prison's alleged constitutional error does not increase the prisoner's total period of confinement, a successful § 1983 action would not necessarily result in an earlier release from incarceration, and hence, does not intrude upon the 'heart' of habeas jurisdiction.

*Id*. at 856-57.

If the purported decision to refuse to acknowledge Neven's modification of Plaintiff's disciplinary segregation term were established, it would not affect the overall length of Plaintiff's confinement in prison. It would merely establish that Plaintiff should have been in general population instead of disciplinary segregation for six months. Therefore, Plaintiff should be permitted to proceed with Count II insofar as it is premised on the alleged refusal to recognize Neven's modification of the disciplinary segregation sanction.[5]

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTINGING IN PART AND DENYING IN PART** Defendants' motion (ECF No. 48) as follows:

(1) Count I should be **DISMISSED WITH PREJUDICE**; and

(2) Count II should **PROCEED**.

As a result, it is recommended that the action should proceed only as to Counts II and III.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be

---

[5] To the extent Defendants' argue this position is incorrect, their argument is belied by NDOC's response to Plaintiff's habeas petition which states: "he cannot complain about disciplinary segregation in a habeas corpus petition because that complaint deals with the conditions of his confinement, not the length of his incarceration." (ECF No. 67 at 7:4-6.)

titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: April 28, 2016.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE